# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

MALINDA FAIRCHILD-CATHEY, on
behalf of herself and all others similarly
situated,

                Plaintiff,

   vs.

AMERICU CREDIT UNION,

                Defendant.

Civil Action No. _____

**JURY TRIAL DEMAND**

## CLASS ACTION COMPLAINT

Plaintiff Malinda Fairchild-Cathey, on behalf of herself and all others similarly situated brings this class action complaint against AmeriCU Credit Union ("AmeriCU" or "Bank"), and alleges the following:

### NATURE OF THE ACTION

1.      Plaintiff brings this action individually and on behalf of all similarly situated consumers against Defendant AmeriCU ("AmeriCU" or "Bank"), arising from its routine practices of (a) assessing more than one insufficient funds fee ("NSF Fee") on the same transaction; and (b) assessing an overdraft fee ("OD Fee") on transactions that did not actually overdraw checking accounts.

2.      AmeriCU's customers have been injured by the Bank's improper practices to the tune of millions of dollars bilked from their accounts in violation AmeriCU's clear contractual commitments.

3.      Plaintiff, on behalf of herself and two Classes of similarly situated consumers, seeks to end AmeriCU's abusive and predatory practices and force it to refund all of these improper charges. Plaintiff asserts a claim for breach of contract, including breach of the covenant of good faith and fair dealing, and seeks damages, restitution, and injunctive relief, as set forth more fully below.

1

4.       While there is nothing unlawful about assessing NSF Fees on accounts when such fees are assessed in compliance with contractual terms, NSF Fees in general have a crushing impact on persons living paycheck to paycheck.  This is why the financial services industry is increasingly moving away from such fees.

5.       For example, one of the nation's largest consumer banks, Ally Bank recently stopped assessing overdraft fees altogether.  Diane Morais, Ally Bank's president of consumer and commercial banking, said that one reason is because NSF Fees disproportionately affect people who are living paycheck to paycheck and that NSF Fees disproportionately affect Black and Latino households. *Overdraft Fees Are Getting the Boot at Ally Financial*, The Wall Street Journal (June 2, 2021),  https://www.wsj.com/articles/overdraft-fees-are-getting-the-boot-at-ally-financial-11622631600 (last accessed June 4, 2021).

6.       Indeed, Black households and those with low-to-moderate incomes are almost twice as likely to incur NSF Fees as white households or those with higher incomes, according to a report from the Financial Health Network, a research firm partly funded by financial institutions.

## PARTIES

7.       Plaintiff is a citizen and resident of Rome, New York.

8.       Defendant AmeriCU is engaged in the business of providing retail banking services to consumers, including Plaintiff and members of the putative Classes. AmeriCU has its headquarters in Rome, New York.

## JURISDICTION AND VENUE

9.       This Court has original jurisdiction of this action under the Class Action Fairness Act of 2005. Pursuant to 28 U.S.C. §§ 1332(d)(2) and (6), this Court has original jurisdiction because (1) the proposed Class is comprised of at least 100 members; (2) at least one member of the proposed class resides

outside of New York; and (3) the aggregate claims of the putative class members exceed $5 million, exclusive of interest and costs.

10.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because AmeriCU is subject to personal jurisdiction here and regularly conducts business in this District, and because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this district.

**FACTUAL BACKGROUND AND GENERAL ALLEGATIONS**

**I.     AMERICU CHARGES MORE THAN ONE FEE ON THE SAME TRANSACTION**

11.     AmeriCU's Account Documents allow AmeriCU to charge a *single* $28 NSF Fee when a transaction is returned for insufficient funds or paid despite insufficient funds.

12.     AmeriCU breaches its Account Documents by charging more than one $28 NSF Fee on the same transaction, since the contract explicitly states—and reasonable consumers understand—that the same transaction can only incur a single NSF Fee.

13.     A recent Washington Post article discussed predatory overdraft fees, labeling NSF fees like those AmeriCU imposes as "indefensible" because "the customer gets hit with multiple charges for the same item." *I bought my kids dinner – and saw firsthand how overdraft fees punish the poor,* The Washington Post (October 1, 2021), https://www.washingtonpost.com/outlook/i-bought-my-kids-dinner--and-saw-firsthand-how-overdraft-fees-punish-the-poor/2021/09/30/32383c40-216e-11ec-b3d6-8cdebe60d3e2_story.html (last accessed October 8, 2021). The banks "are charging a fee for doing literally nothing.... [T]his is like asking a friend if I can borrow $20, only to have him take $10 out of my wallet for turning down my request." *Id*.

14.     AmeriCU's abusive practices are not standard within the financial services industry. Indeed, major banks like Wells Fargo—one of the largest consumer banks in the country—charge one NSF Fee per item, even if that item is resubmitted for payment multiple times. And while some other

3

banks engage in the same practices as AmeriCU, their members agree to terms authorizing the fee practice.

15. AmeriCU's Account Documents do not say that AmeriCU may repeatedly charge customers multiple fees on a single transaction. To the contrary, the Account Documents indicate AmeriCU will only charge a single NSF Fee on a transaction.

**A. Plaintiff's Experiences.**

16. In support of her claim, Plaintiff offers examples of fees that should not have been assessed against his checking account. As alleged below, AmeriCU: (a) reprocessed previously declined transactions; and (b) charged an additional fee upon reprocessing.

17. For example, on November 14, 2016 and July 12, 2017, Plaintiff was charged $28 NSF Fees on transactions which were resubmitted by the merchant for payment without Plaintiff's request to reprocess the transactions. The re-submitted transactions were specifically labeled as "RETRY PYMT" on her statements.

18. Each merchant request for payment was for a single transaction and, as is laid out in AmeriCU's Account Documents, should be subject to, at most, a single NSF Fee (if AmeriCU returned it or paid it).

**B. The Imposition of Multiple Fees on a Single Transaction Violates AmeriCU's Express Promises and Representations.**

19. AmeriCU's Account Documents state that the Bank will assess a single fee of $28 for a transaction that is returned due to insufficient funds.

20. According to AmeriCU's schedule of fees, at most a *single* fee will be assessed per "each" item:

Return Check Fee
(i.e., Overdrawn)..................................................................$28 each
Items returned for
Insufficient/uncollected
funds

Overdraft Fee…..............................................................$28 each
Member Privilege (MP) Overdraft Fee*…......................................$28 each

Ex. A.

21.     The same check, ACH, or other electronic payment on an account is not a new "item" each time it is rejected for payment then reprocessed, especially when—as here—Plaintiff took no action to resubmit the transaction.

22.     Indeed, the example provided by AmeriCU itself does not allow for AmeriCU to reprocess a single transaction and charge multiple NSF Fees. Even if AmeriCU reprocesses an instruction for payment, it is still the same item. The Bank's reprocessing is simply another attempt to effectuate an accountholder's original order or instruction.

23.     As alleged herein, Plaintiff took only a single action to make a single payment; she therefore created only one transaction and may be charged only a single fee.

24.     As the disclosures described above show, Plaintiff never agreed that AmeriCU may assess multiple NSF Fees for a transaction that was returned for insufficient funds and later reprocessed one or more times and returned again.

25.     In sum, AmeriCU promises that one $28 NSF Fee will be assessed per item, and this must mean all iterations of the same instruction for payment. As such, AmeriCU breached the contract when it charged more than one fee per transaction.

26.     A reasonable consumer would understand that AmeriCU's Account Documents permit it to assess an NSF Fee only once per "item."

27.     Taken together, the representations and omissions identified above convey to customers that all submissions for payment of the same transaction will be treated as the same "item," which the Bank will either pay (resulting in an overdraft item) or return (resulting in a returned transaction) when it decides there are insufficient funds in the account. Nowhere do AmeriCU and its customers agree that AmeriCU will treat each reprocessing of a check or ACH payment as a separate transaction, subject to additional fees.

28.     Customers reasonably understand, based on the language of the Account Documents, that the Bank's attempts to reprocess checks or ACH payments are simply additional attempts to complete the original order or instruction for payment, and as such, will not trigger additional NSF Fees. In other words, it is always the same transaction.

29.     Banks like AmeriCU that employ this abusive multiple fee practice know how to plainly and clearly disclose it. Indeed, other banks and credit unions that engage in this abusive practice require their accountholders to expressly authorize it—something AmeriCU never did.

30.     For example, First Hawaiian Bank engages in the same abusive practices as AmeriCU, but at least currently discloses it in its online banking agreement, in all capital letters, as follows:

> YOU AGREE THAT MULTIPLE ATTEMPTS MAY BE MADE TO SUBMIT A RETURNED ITEM FOR PAYMENT AND THAT **MULTIPLE FEES MAY BE CHARGED TO YOU AS A RESULT OF A RETURNED ITEM AND RESUBMISSION**.

*Terms and Conditions of FHB Online Services*, First Hawaiian Bank 40, https://bit.ly/2KWMvTg (last accessed Jan. 28, 2021) (emphasis added).

31.     Klein Bank similarly states in its online banking agreement:

> [W]e will charge you an NSF/Overdraft Fee each time: (1) a Bill Payment (electronic or check) is submitted to us for payment from your Bill Payment Account when, at the time of posting, your Bill Payment Account is overdrawn, would be overdrawn if we paid the item (whether or not we in fact pay it) or does not have sufficient available funds; or (2) we return, reverse, or decline to pay an item for any other reason authorized by the terms and conditions governing your Bill Payment Account. **We will charge an NSF/Overdraft**

**Fee as provided in this section regardless of the number of times an item is submitted or resubmitted to us for payment, and regardless of whether we pay the item or return, reverse, or decline to pay the bill payment.**

*Consumer Account Terms and Conditions*, Klein Bank 4 (Jan. 2013), https://bit.ly/2KVCkhI (emphasis added).

32.     Central Pacific Bank, a leading bank in Hawai'i, states in its deposit account under the "MULTIPLE NSF FEES" subsection:

Items and transactions (such as, for example, checks and electronic transactions/payments) returned unpaid due to insufficient/non-sufficient funds ("NSF") in your account, may be resubmitted one or more times for payment, and a returned item/transaction fee will be imposed on you each time an item and transaction resubmitted for payment is returned due to insufficient/non-sufficient funds.

*Miscellaneous Fee Schedule*, Central Pacific Bank 1 (Jan. 4. 2021), https://www.cpb.bank/media/2776/fee-001.pdf (last accessed June 4, 2021).

33.     BP Credit Union likewise states: "We may charge a fee each time an item is submitted or resubmitted for payment; therefore, you may be assessed more than one fee as a result of a returned item and resubmission(s) of the returned item." *Membership and Account Agreement,* BP Federal Credit Union, ¶ 14(a), https://www.bpfcu.org/images/docs/membership-agreement.pdf (last accessed June 4, 2021).

34.     Regions Bank likewise states:

If an item is presented for payment on your account at a time when there is an insufficient balance of available funds in your account to pay the item in full, you agree to pay us our charge for items drawn against insufficient or unavailable funds, whether or not we pay the item. If any item is presented again after having previously been returned unpaid by us, you agree to pay this charge for each time the item is presented for payment and the balance of available funds in your account is insufficient to pay the item.

*Deposit Agreement*, Regions Bank 18 (2018), https://bit.ly/2L0vx6A (last accessed June 4, 2021).

35.     Andrews Federal Credit Union states:

You understand and agree that a merchant or other entity may make multiple attempts to resubmit a returned item for payment. Consequently, because we may charge a service fee

for an NSF item each time it is presented, we may charge you more than one service fee for any given item. Therefore, multiple fees may be charged to you as a result of a returned item and resubmission regardless of the number of times an item is submitted or resubmitted to use for payment, and regardless of whether we pay the item or return, reverse, or decline to pay the item. When we charge a fee for NSF items, the charge reduces the available balance in your account and may put your account into (or further into) overdraft.

*Terms & Conditions*, Andrews Federal Credit Union 17 (Aug. 2020), ¶ 6, https://bit.ly/3iXEdHb (last accessed June 4, 2021).

36. Consumers Credit Union states:

Consequently, because we may charge a service fee for an NSF item each time it is presented, we may charge you more than one service fee for any given item. Therefore, multiple fees may be charged to you as a result of a returned item and resubmission regardless of the number of times an item is submitted or resubmitted to us for payment, and regardless of whether we pay the item or return, reverse, or decline to pay the item.

*Member Services Guide*, Consumers Credit Union 5 (Apr. 2020), ¶ 11a, https://bit.ly/3iVM1ta (last accessed June 4, 2021).

37. Wright Patt Credit Union states:

Consequently, because we may charge a service fee for an NSF item each time it is presented, we may charge you more than one service fee for any given item. Therefore, multiple fees may be charged to you as a result of a returned item and represented regardless of the number of times an item is presented or represented to us for payment, and regardless of whether we pay the item or return, reverse, or decline to pay the item.

*Important Account Information*, Wright Patt Credit Union 13 (July 2020), ¶ 6.1, (last accessed June 4, 2021).

38. Railroad & Industrial Federal Credit Union states:

Consequently, because we may charge an NSF fee for an NSF item each time it is presented, we may charge you more than one NSF fee for any given item. Therefore, multiple fees may be charged to you as a result of a returned item and resubmitted to us for payment, and regardless of whether we pay the item or return, reverse, or decline to pay the item.

*Important Account Information for Our Members*, Railroad & Industrial Federal Credit Union, p. 2, (Aug. 1, 2019), https://bit.ly/3t5ehhF (last accessed June 4, 2021).

39.     Partners 1st Federal Credit Union states:

Consequently, because we may charge a fee for an NSF item each time it is presented, we may charge you more than one fee for any given item. Therefore, multiple fees may be charged to you as a result of a returned item and resubmission regardless of the number of times an item is submitted or resubmitted to us for payment, and regardless of whether we pay the item or return, reverse, or decline to pay the item.

*Consumer Membership & Account Agreement*, Partners 1st Federal Credit Union, p. 11 (Sept. 15, 2019),

https://bit.ly/39pDZWb (last accessed March 2, 2021).

40.     Members First Credit Union states:

We reserve the right to charge an Non-Sufficient Funds Fee (NSF Fee) each time a transaction is presented if your account does not have sufficient funds to cover the transaction at the time of presentment and we decline the transaction for that reason. **This means that a transaction may incur more than one Non-Sufficient Funds Fee (NSF Fee) if it is presented more than once** . . . we reserve the right to charge a Non-Sufficient Funds (NSF Fee) for both the original presentment and the representment[.]

*Membership and Account Agreement*, Members First Credit Union of Florida 3, https://bit.ly/39rRJ2Y

(last accessed March 2, 2021).

41.     Community Bank, N.A. states:

We cannot dictate whether or not (or how many times) a merchant will submit a previously presented item. You may be charged more than one Overdraft or NSF Fee if a merchant submits a single transaction multiple times after it has been rejected or returned.

*Overdraft and Unavailable Funds Practices Disclosure*, Community Bank 5 (Nov. 12, 2019),

https://bit.ly/3iY9dH2 (last accessed June 4, 2021).

42.     RBC Bank states:

We may also charge against the Account an NSF fee for each item returned or rejected, including for multiple returns or rejections of the same item.

*Service Agreement for Personal Accounts*, RBC Bank 13 (Sept. 17, 2014), https://bit.ly/3otUtko (last

accessed June 4, 2021).

43.     Diamond Lakes Credit Union states,

Your account may be subject to a fee for each item regardless of whether we pay or return the item. We may charge a fee each time an item is submitted or resubmitted for payment; therefore, you may be assessed more than one fee as a result of a returned item and resubmission(s) of the returned item.

*Membership and Account Agreement*, Diamond Lakes Federal Credit Union, https://bit.ly/39o2P94 (last accessed June 4, 2021).

44.     Parkside Credit Union states,

If the Credit Union returns the item, you will be assessed an NSF Fee. Note that the Credit Union has no control over how many times an intended payee may resubmit the same check or other item to us for payment. In the event the same check or other item is presented for payment on more than one occasion, your account will be subject to an additional charge on each occasion that the item is presented for payment. There is no limit to the total fees the Credit Union may charge you for overdrawing your account.

*Membership and Account Agreement*, Parkside Credit Union 21 (Jan. 30, 2020), https://bit.ly/3aaXfpG (last accessed March 2, 2021).

45.     AmeriCU provides no such disclosure, and by not doing so, deceives its accountholders.

**C.     The Imposition of Multiple Fees on a Single Transaction Breaches AmeriCU's Duty of Good Faith and Fair Dealing.**

46.     Parties to a contract are required not only to adhere to the express conditions in the contract, but also to act in good faith when they are vested with a discretionary power over the other party. Further, as to bank transactions, the Uniform Commercial Code ("UCC")—which has been adopted by all states—mandates good faith and fair dealing. As such, when a party such as AmeriCU gives itself discretion to act, the party with discretion is required to exercise that power and discretion in good faith. This creates an implied promise to act in accordance with the parties' reasonable expectations and means that the Bank is prohibited from exercising its discretion to enrich itself and gouge its customers. Indeed, the Bank has a duty to honor transaction requests in a way that is fair to Plaintiff and its other customers and is prohibited from exercising its discretion to pile on ever greater penalties.

47. Here—in the adhesion agreements AmeriCU foisted on Plaintiff and its other customers—AmeriCU has provided itself numerous discretionary powers affecting customers' bank accounts. But instead of exercising that discretion in good faith and consistent with consumers' reasonable expectations, the Bank abuses that discretion to take money out of consumers' accounts without their permission and contrary to their reasonable expectations that they will not be charged multiple fees for the same transaction.

48. AmeriCU exercises its discretion in its own favor—and to the prejudice of Plaintiff and its other customers—when it defines "item" in a way that directly leads to more NSF Fees. Further, AmeriCU abuses the power it has over customers and their bank accounts and acts contrary to their reasonable expectations under the Account Documents. This is a breach of the Bank's implied covenant to engage in fair dealing and act in good faith.

49. By exercising its discretion in its own favor—and to the prejudice of Plaintiff and other customers—by charging more than one fee on a single transaction, AmeriCU breaches the reasonable expectation of Plaintiff and other customers and in doing so violates the implied covenant to act in good faith.

50. It was bad faith and totally outside Plaintiff's reasonable expectations for AmeriCU to use its discretion to assess multiple NSF Fees for a single attempted payment.

## II. DEFENDANT CHARGES OD FEES ON TRANSACTIONS THAT DO NOT ACTUALLY OVERDRAW THE ACCOUNT

51. Plaintiff has a checking account with Defendant.

52. Defendant issues debit cards to its checking account customers, including Plaintiff, which allows its customers to have electronic access to their checking accounts for purchases, payments, withdrawals, and other electronic debit transactions.

53.     Pursuant to its Account Documents, Defendant charges fees for transactions that purportedly result in an overdraft.

54.     Plaintiff brings this cause of action challenging Defendant's practice of charging OD Fees on what are referred to in this complaint as "Authorize Positive, Purportedly Settle Negative Transactions" ("APPSN Transactions").

55.     Here's how it works. At the moment debit card transactions are authorized on an account with positive funds to cover the transaction, Defendant immediately reduces accountholders' checking accounts by the amount of the purchase, sets aside funds in a checking account to cover that transaction, and as a result, the accountholder's displayed "available balance" reflects that subtracted amount. Therefore, customers' accounts will always have sufficient available funds to cover these transactions because Defendant has already sequestered these funds for payment.

56.     However, Defendant still assesses crippling OD Fees on many of these transactions and mispresents its practices in its Account Documents.

57.     Despite putting aside sufficient available funds for debit card and other POS transactions at the time those transactions are authorized, Defendant later assesses OD Fees on those same transactions when they purportedly settle days later into a negative balance. These types of transactions are APPSN Transactions.

58.     Defendant maintains a running account balance in real time, tracking funds accountholders have for immediate use. This running account balance is adjusted, in real-time, to account for debit card transactions at the precise instance they are made. When a customer makes a purchase with a debit card, Defendant sequesters the funds needed to pay the transaction, subtracting the dollar amount of the transaction from the customer's available balance. Such funds are not available for any other use by the accountholder, and such funds are specifically associated with a given debit card transaction.

59.     That means when any *subsequent*, intervening transactions are initiated on a checking account, they are compared against an account balance that has already been reduced to account for any earlier debit card transactions. This means that many subsequent transactions incur OD Fees due to the unavailability of the funds sequestered for those debit card transactions.

60.     Still, despite keeping those held funds off-limits for other transactions, Defendant improperly charges OD Fees on those APPSN Transactions, even though the APPSN Transactions *always* have sufficient available funds to be covered.

61.     Indeed, the Consumer Financial Protection Bureau ("CFPB") has expressed concern with this very issue, flatly calling the practice "unfair" and/or "deceptive" when:

> A financial institution authorized an electronic transaction, which reduced a customer's available balance but did not result in an overdraft at the time of authorization; settlement of a subsequent unrelated transaction that further lowered the customer's available balance and pushed the account into overdraft status; and when the original electronic transaction was later presented for settlement, because of the intervening transaction and overdraft fee, the electronic transaction also posted as an overdraft and an additional overdraft fee was charged. Because such fees caused harm to consumers, one or more supervised entities were found to have acted unfairly when they charged fees in the manner described above. Consumers likely had no reason to anticipate this practice, which was not appropriately disclosed. They therefore could not reasonably avoid incurring the overdraft fees charged. Consistent with the deception findings summarized above, examiners found that the failure to properly disclose the practice of charging overdraft fees in these circumstances was deceptive. At one or more institutions, examiners found deceptive practices relating to the disclosure of overdraft processing logic for electronic transactions. Examiners noted that these disclosures created a misimpression that the institutions would not charge an overdraft fee with respect to an electronic transaction if the authorization of the transaction did not push the customer's available balance into overdraft status. But the institutions assessed overdraft fees for electronic transactions in a manner inconsistent with the overall net impression created by the disclosures. Examiners therefore concluded that the disclosures were misleading or likely to mislead, and because such misimpressions could be material to a reasonable consumer's decision-making and actions, examiners found the practice to be deceptive. Furthermore, because consumers were substantially injured or likely to be so injured by overdraft fees assessed contrary to the overall net impression created by the disclosures (in a manner not outweighed by countervailing benefits to consumers or competition), and because consumers could not reasonably avoid the fees (given the misimpressions created by the disclosures), the practice of assessing fees under these circumstances was found to be unfair.

Consumer Financial Protection Bureau, Winter 2015 "Supervisory Highlights."

62.     There is no justification for these practices, other than to maximize Defendant's OD Fee revenue. APPSN Transactions only exist because intervening checking account transactions supposedly reduce an account balance. But Defendant is free to protect its interests and either reject those intervening transactions or charge OD Fees on those intervening transactions—and it does the latter to the tune of millions of dollars each year. But Defendant was not content with these millions in OD Fees. Instead, it sought millions *more* in OD Fees on these APPSN Transactions.

63.     Besides being unfair and unjust, these practices breach contract promises made in Defendant's adhesion contracts—contracts which fail to inform accountholders about the true nature of Defendant's processes and practices. These practices also exploit contractual discretion to gouge accountholders.

64.     In plain, clear, and simple language, the Account Documents covering OD Fees promise that Defendant will only charge OD Fees on transactions that have insufficient funds to cover that transaction.

65.     In short, Defendant is not authorized by contract to charge OD Fees on transactions that have not overdrawn an account, but it has done so and continues to do so.

**A.     Mechanics of a Debit Card Transaction**

66.     A debit card transaction occurs in two parts. First, authorization for the purchase amount is instantaneously obtained by the merchant from Defendant. When a merchant physically or virtually "swipes" a customer's debit card, the credit card terminal connects, via an intermediary, to Defendant, which verifies that the customer's account is valid and that sufficient available funds exist to cover the transaction amount.

67.     At this step, if the transaction is approved, Defendant immediately decrements the funds in an accountholder's account and sequesters funds in the amount of the transaction but does not yet transfer the funds to the merchant.

14

68.     Indeed, the entire purpose of the immediate debit and hold of positive funds is to ensure that there are enough funds in the account to pay the transaction when it settles, as discussed in the Federal Register notice announcing revisions to certain provisions of the Truth in Lending Act regulations:

> When a consumer uses a debit card to make a purchase, a hold may be placed on funds in the consumer's account to ensure that the consumer has sufficient funds in the account when the transaction is presented for settlement. This is commonly referred to as a "debit hold." During the time the debit hold remains in place, which may be up to three days after authorization, those funds may be unavailable for the consumer's use for other transactions.

Federal Reserve Board, Office of Thrift Supervision, and National Credit Union Administration, Unfair or Deceptive Acts or Practices, 74 FR 5498-01 (Jan. 29, 2009).

69.     Sometime thereafter, the funds are actually transferred from the customer's account to the merchant's account.

70.     Defendant (like all banks and credit unions) decides whether to "pay" debit card transactions at authorization. After that, Defendant is obligated to pay the transaction no matter what. For debit card transactions, that moment of decision can only occur at the point of sale, at the instant the transaction is authorized or declined. It is at that point—and only that point—when Defendant may choose to either pay the transaction or decline it. When the time comes to actually settle the transaction, it is too late—the financial institution has no discretion and must pay the charge. This "must pay" rule applies industry wide and requires that, once a financial institution authorizes a debit card transaction, it "must pay" it when the merchant later makes a demand, regardless of other account activity. *See* Electronic Fund Transfers, 74 Fed. Reg. 59033-01, 59046 (Nov. 17, 2009).

71.     There is no change—no impact whatsoever—to the available funds in an account when this step occurs.

**B.      Defendant's Account Contract**

72.     Plaintiff has a checking account with Defendant, which is governed by Defendant's standardized Account Documents.

73.     The Account Documents promise in pertinent part:

> There are several ways your account can become overdrawn, such as (1) the payment of checks, electronic funds transfers or other withdrawal requests; (2) *payments authorized by you (i.e. debit card at point of sale)*; (3) the return of unpaid items deposited by you; (4) AmeriCU service charges; or (5) the deposit of items which, according to AmeriCU's Funds Availability Policy, are treated as not yet available.

(emphasis added).

74.     For APPSN Transactions, which are immediately deducted from a positive account balance and should be held aside for payment of that same transaction, there are always funds to cover those transactions—yet AmeriCU assesses OD Fees on them anyway.

75.     The above promises mean that transactions are only overdraft transactions when they are authorized into a negative account balance. Of course, that is not true for APPSN Transactions.

76.     APPSN transactions are always initiated at a time when there are sufficient available funds in the account.

77.     In fact, AmeriCU actually authorizes transactions on positive funds, claims to set those funds aside on hold, but then fails to use those same funds to settle those same transactions. Instead, it uses a secret posting process described below.

78.     All the above representations and contractual promises are untrue. In fact, AmeriCU charges OD Fees even when sufficient funds exist to cover transactions that are authorized into a positive balance. No express language in any document states that AmeriCU may impose OD Fees on any APPSN Transactions.

79.     First, and most fundamentally, AmeriCU charges OD Fees on debit card transactions for which there are sufficient funds available to cover the transactions. That is despite contractual

representations that AmeriCU will only charge OD Fees on transactions with insufficient available funds to cover a given transaction.

80.     AmeriCU assesses OD Fees on APPSN Transactions that **_do_** have sufficient funds available to cover them throughout their lifecycle.

81.     AmeriCU's practice of charging OD Fees even when sufficient available funds exist to cover a transaction violates a contractual promise not to do so. This discrepancy between AmeriCU's actual practice and the contract causes accountholders like the Plaintiff to incur more OD Fees than they should.

82.     Next, sufficient funds for APPSN Transactions are actually debited from the account immediately, consistent with standard industry practice.

83.     Because these withdrawals take place upon initiation, they cannot be re-debited later. But that is what AmeriCU does when it re-debits the account during a secret batch posting process.

84.     In reality, AmeriCU's actual practice is to deduct the same debit card transaction twice to determine if the transaction overdraws an account—both at the time a transaction is authorized and later at the time of settlement.

85.     At the time of settlement, however, an available balance *does not change at all* for these transactions previously authorized into good funds. As such, AmeriCU cannot then charge an OD Fee on such transaction because the available balance has not been rendered insufficient due to the pseudo-event of settlement.

86.     Upon information and belief, something more is going on: at the moment a debit card transaction is getting ready to settle, AmeriCU does something new and unexpected, during the middle of the night, during its nightly batch posting process. Specifically, AmeriCU releases the hold placed on funds for the transaction for a split second, putting money back into the account, then re-debits the same transaction a second time.

87.     This secret step allows AmeriCU to charge OD Fees on transactions that never should have caused an overdraft—transactions that were authorized into sufficient funds, and for which AmeriCU specifically set aside money to pay them.

88.     This discrepancy between AmeriCU's actual practices and the contract causes accountholders to incur more OD Fees than they should.

89.     In sum, there is a huge gap between AmeriCU's practices as described in the Account Documents and AmeriCU's practices in reality.

## C.     Defendant Abuses Contractual Discretion

90.     Defendant's treatment of debit card transactions to charge OD Fees is not simply a breach of the express terms of the numerous Account Documents. In addition, Defendant exploits contractual discretion to the detriment of accountholders when it uses these policies.

91.     Defendant uses its contractual discretion to cause APPSN Transactions to incur OD Fees by knowingly authorizing later transactions that it allows to consume available funds previously sequestered for APPSN Transactions.

92.     Defendant uses this contractual discretion unfairly to extract OD Fees on transactions that no reasonable accountholder would believe could cause OD Fees.

## D.     Reasonable Accountholders Understand Debit Card/POS Transactions Are Debited Immediately

93.     The assessment of OD Fees on APPSN Transactions is fundamentally inconsistent with immediate deduction and holding of funds for debit card/POS transactions. That is because, if funds are immediately debited from the balance and held, they cannot be depleted by intervening transactions (and it is that subsequent depletion that is the necessary condition of APPSN Transactions). If funds are immediately debited from the available balance, then they are necessarily available to be applied to the debit card transactions for which they are debited.

94.     Defendant was and is aware that this is precisely how accountholders reasonably understand such transactions to work.

95.     Defendant knows that many accountholders prefer debit cards for this very reason. Research indicates that accountholders prefer debit cards as a budgeting device because they do not allow debt like credit cards do, and because the money comes directly out of a checking account.

96.     Consumer Action, a national nonprofit consumer education and advocacy organization, advises consumers determining whether they should use a debit card that "[t]here is no grace period on debit card purchases the way there is on credit card purchases; the money is immediately deducted from your checking account. Also, when you use a debit card you lose the one or two days of 'float' time that a check usually takes to clear." *What Do I Need to Know About Using a Debit Card?*, Consumer Action (Jan. 14, 2019), https://www.consumer-action.org/helpdesk/articles/what_do_i_need_to_know_about_using_a_debit_card (last visited June 4, 2021).

97.     Further, Consumer Action informs consumers that "Debit cards offer the convenience of paying with plastic without the risk of overspending. When you use a debit card, you do not get a monthly bill. You also avoid the finance charges and debt that can come with a credit card if not paid off in full." *Understanding Debit Cards*, Consumer Action, http://www.consumer-action.org/english/articles/understanding_debit_cards (last visited June 4, 2021).

98.     This understanding is a large part of the reason that debit cards have risen in popularity. The number of terminals that accept debit cards in the United States increased by approximately 1.4 million in a recent five year period and, with that increasing ubiquity, consumers have (along with credit cards) viewed debit cards "as a more convenient option than refilling their wallets with cash from an ATM." Maria LaMagna, *Debit Cards Gaining on Case for Smallest Purchases,* MarketWatch, Mar. 23,

2016, http://www.marketwatch.com/story/morepeople-are-using-debit-cards-to-buy-a-pack-of-gum-2016-03-23.

99.    Not only have accountholders increasingly transitioned from cash to debit cards, but they believe that a debit card purchase is the fundamental equivalent of a cash purchase, with the swipe of a card equating to handing over cash, permanently and irreversibly.

100.    Defendant was aware of accountholder perception that debit transactions reduce an available balance *in a specified order*—namely, the moment they are actually initiated—and its account agreement only supports this perception.

E.    **Plaintiff's Experience**

101.    As examples, on July 5, 2019 and March 24, 2019, Plaintiff was assessed OD Fees for debit card transactions that settled that day, despite the fact that positive funds were deducted immediately, prior to that day, for the transaction on which Plaintiff was assessed the OD Fee. At the time that the positive funds were deducted, Plaintiff had a positive balance, which would not have caused an OD Fee.

## CLASS ACTION ALLEGATIONS

102.    Plaintiff brings this action on behalf of herself and all others similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure.  This action satisfies the numerosity, commonality, typicality, adequacy, predominance and superiority requirements of Rule 23.  The proposed classes are defined as:

> All AmeriCU accountholders who, during the applicable statute of limitations, were charged OD Fees on debit card transactions that were authorized into a positive available balance ("APPSN class").

> All AmeriCU accountholders who, during the applicable statute of limitations, were charged more than one NSF Fee on the same item ("Multi NSF class").

103.     Excluded from the Classes are Defendant, Defendant's subsidiaries and affiliates, their officers, directors and member of their immediate families and any entity in which Defendant has a controlling interest, the legal representatives, heirs, successors or assigns of any such excluded party, the judicial officer(s) to whom this action is assigned, and the members of their immediate families.

104.     Plaintiff reserves the right to modify or amend the definition of the proposed Classes and/or to add a subclass(es), if necessary, before this Court determines whether certification is appropriate.

105.     The questions here are ones of common or general interest such that there is a well-defined community of interest among the members of the Classes. These questions predominate over questions that may affect only individual class members because AmeriCU has acted on grounds generally applicable to the class.  Such common legal or factual questions include, but are not limited to:

a)     Whether AmeriCU improperly charged OD Fees on APPSN Transactions;

b)     Whether AmeriCU improperly charged multiple NSF Fees on the same transaction;

c)     Whether the conduct enumerated above violates the contract;

d)     Whether the conduct enumerated above violates the covenant of good faith and fair dealing;

e)     The appropriate measure of damages.

106.     The parties are numerous such that joinder is impracticable.  Upon information and belief, and subject to class discovery, the Classes consist of thousands of members or more, the identity of whom are within the exclusive knowledge of and can be ascertained only by resort to AmeriCU's records. AmeriCU has the administrative capability through its computer systems and other records to identify all members of the Classes, and such specific information is not otherwise available to Plaintiff.

107.     It is impracticable to bring members of the Classes' individual claims before the Court. Class treatment permits a large number of similarly situated persons or entities to prosecute their common

claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort, expense, or the possibility of inconsistent or contradictory judgments that numerous individual actions would engender. The benefits of the class mechanism, including providing injured persons or entities with a method for obtaining redress on claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

108. Plaintiff's claims are typical of the claims of the other members of the Classes in that they arise out of the same wrongful business practices by AmeriCU, as described herein.

109. Plaintiff is a more than adequate representative of the Classes in that Plaintiff is an AmeriCU checking accountholder and has suffered damages as a result of AmeriCU's contract violations. In addition:

a) Plaintiff is committed to the vigorous prosecution of this action on behalf of herself and all others similarly situated and has retained competent counsel experienced in the prosecution of class actions and, in particular, class actions on behalf of accountholders against financial institutions;

b) There is no conflict of interest between Plaintiff and the unnamed members of the Classes;

c) Plaintiff anticipates no difficulty in the management of this litigation as a class action; and

d) Plaintiff's legal counsel has the financial and legal resources to meet the substantial costs and legal issues associated with this type of litigation.

110. Plaintiff knows of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

111. AmeriCU has acted or refused to act on grounds generally applicable to the class, thereby making appropriate corresponding declaratory relief with respect to the Classes as a whole.

112. All conditions precedent to bringing this action have been satisfied and/or waived.

**BREACH OF CONTRACT INCLUDING THE**
**COVENANT OF GOOD FAITH AND FAIR DEALING**
**(Individually and on Behalf of the Classes)**

113. Plaintiff repeats and incorporates all of the preceding allegations as if fully set forth herein.

114. Plaintiff, and all members of the proposed Classes contracted with AmeriCU for checking account services, including debit card services.

115. AmeriCU breached promises made to Plaintiff and all members of the proposed Classes when as described herein, AmeriCU charged OD Fees as a result of transactions that did not overdraw a checking account and when it assessed more than one NSF Fee on the same transaction.

116. In addition, there exists an implied covenant of good faith and fair dealing in all contracts that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit – not merely the letter – of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form. Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

117. Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty. Examples of bad faith are evasion of the spirit of the bargain, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.

118. The implied covenant of good faith and fair dealing applies to the performance and enforcement of contracts, limits the parties' conduct when their contract defers decision on a particular term, omits terms, or provides ambiguous terms.

119. AmeriCU has breached the covenant of good faith and fair dealing and abused its discretion in its contract as described herein. Specifically, AmeriCU should not have used its discretion to charge OD Fees on APPSN Transactions. The Account Documents do not have a contract term

permitting OD Fees on such transactions, nor multiple NSF Fees on the same transaction, and the documents are otherwise ambiguous as to any right for AmeriCU to charge OD Fees on APPSN Transactions.

120.   Plaintiff and all members of the proposed Classes have performed all, or substantially all, of the obligations imposed on them under the contract.

121.   Plaintiff and all members of the proposed Classes have sustained damages as a result of AmeriCU's breaches of the contract.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Classes, demands a jury trial on all claims so triable and judgment as follows:

A.   Certification for this matter to proceed as a class action on behalf of the Classes;

B.   Declaring AmeriCU's OD Fee policies and practices to be in breach of its contract with accountholders;

C.   Restitution of all OD Fees and improperly assessed paid to AmeriCU by Plaintiff and the members of the Classes, as a result of the wrongs alleged herein in an amount to be determined at trial;

D.   Actual damages in an amount according to proof;

E.   Pre-judgment and post-judgment interest at the maximum rate permitted by applicable law;

F.   For costs and attorneys' fees under the common fund doctrine, and all other applicable law; and

G.   Such other relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff and all others similarly situated hereby demand trial by jury on all issues in this Class

Action Complaint that are so triable.

Dated:  October 27, 2021                                    Respectfully submitted,


                                                           By:*/s/ Jeffrey D. Kaliel*_____
                                                              Jeffrey D. Kaliel
                                                              KALIELGOLD PLLC
                                                              1100 15th Street NW, 4th Floor
                                                              Washington, D.C.  20005
                                                              (202) 350-4783
                                                              *jkaliel@kalielpllc.com*

                                                              Sophia G. Gold
                                                              KALIELGOLD PLLC
                                                              950 Gilman Street, Suite 200
                                                              Berkeley, California 94710
                                                              (202) 350-4783
                                                              sgold@kalielgold.com

                                                              *Attorneys for Plaintiff and the Putative Class*